Roger M. SHAW and Richard A. Winn

v.

The BOARD OF TRUSTEES OF the FREDERICK COMMUNITY COLLEGE, a Governmental Corporation, et al.

Civ. A. No. 73-1055-M.

United States District Court, D. Maryland.

April 25, 1975.

J. Cookman Boyd, Walter S. Levin, Susan W. Russell, and Sauerwein, Boyd & Decker, Baltimore, Md., for plaintiffs.

Samuel S. Smalkin, and Robert B. Barnhouse and Piper & Marbury, Baltimore, Md., for defendants.

*Opinion and Order*

JAMES R. MILLER, Jr., District Judge.

This is a case in which the naiveté and misjudgments of the plaintiffs, combined with their apparent lack of competent advice, have resulted in the loss of their responsible jobs at the Frederick Community College although others, more culpable than the plaintiffs, did not suffer the same fate. This seemingly anomalous result was brought about through a series of misunderstandings, misinterpretations, and misadventures, outlined in substance in this opinion, which, in combination, provided legal justification for the action taken by the Board of Trustees of the Frederick Community College in ending the employment of the plaintiffs.

Jurisdiction is asserted under 28 U.S. C. §§ 1331 and 1343, and under 42 U.S. C. § 1983, as well as other sections of the United States Code, alleging that plaintiffs have been deprived of rights granted by the First and Fourteenth Amendments to the Federal Constitu-

tion. This opinion shall constitute the court's findings of fact and conclusions of law.

Frederick Community College is a public institution of higher education in Frederick County, Maryland, funded by revenues in certain stated percentages from the State, Frederick County, and student fees.[1] The members of the Frederick County Board of Education, during the times pertinent to the events described in this case, constituted the Board of Trustees of the College, and, as such, had the power "to maintain and exercise general control over the community college . . . and to adopt reasonable rules, by-laws or regulations to effectuate and carry out . . ." the purposes of the college.[2]

Roger M. Shaw, one of the plaintiffs, had been employed as a teacher at the college since 1968. In 1970 he was made a full professor and Chairman of the Division of Social Sciences. He was granted tenure in 1972 by the Board of Trustees.

Richard A. Winn, the other plaintiff, became employed by the college in 1969 as a teacher. In 1971 he was appointed as Chairman of the Division of Business and Technologies. His academic rank was that of Associate Professor. In March, 1973 the Board authorized a "continuing appointment" for. Professor Winn, effective as of June, 1972.

The Board of Trustees adopted and maintained during the time pertinent to this decision a "Policy Manual" which was designed generally to be the official repository of the rules and regulations established by the Board for the governance of the college. All the professional staff members of the college were given copies of the Policy Manual upon entering employment and copies of amendments thereto when adopted. They were instructed to familiarize themselves with its provisions.

Sec. 3.100 of the Policy Manual designated Division Chairmen as "professional administrative staff members." Among the other conditions of employment relating to fulltime professional administrative staff members, sec. 3.203–2.c of the Policy Manual states:

"Attendance and participation shall be required at *Commencement,* scheduled staff meetings, *scheduled work shops,* and other scheduled professional activities." (Emphasis supplied).

As Division Chairmen, Professors Shaw and Winn devoted approximately 40% of their time to administrative duties and approximately 60% to their teaching responsibilities. They were members of DISAC (Dean of Instructional Services Advisory Committee), an informal group composed of Division Chairmen and Dr. Mitlehner, the Dean of Instructional Services.

Foment began on the campus of Frederick Community College in the Fall of 1971 when the Board decided to eliminate the concept of tenure for all professional staff members who had not previously achieved that status and to substitute for it the concept of "continuing appointments" under which a member of the professional staff, after completion of a probationary status, could be awarded a three-year contract which could thereafter be renewed on certain conditions. The faculty[3] of the college disagreed with the abolition of tenure. Agitation grew among the faculty to establish a direct means of faculty negotiation with the Board of Trustees over conditions of employment. A faculty organization, the College Council, which had been viewed as a creature of the college administration, was disbanded by vote of the faculty.

In 1972 there was evidence a number of the faculty members planned to exhibit their displeasure by refusing to march in the 1972 commencement in ac-

1. Article 77A, § 7, Md.Ann.Code (1975 Repl. Vol.).

2. Article 77A, § 1, Md.Ann.Code (1975 Repl. Vol.).

3. Unless the context otherwise indicates, the term "faculty" as used herein applies to professional staff employees of the college, whether in teaching or non-teaching positions.

ademic regalia. Dr. Stephens, the College President, pursuant to a resolution of the Board of Trustees on April 26, 1972, published and distributed to all staff members a notice making it clear that attendance at commencement exercises and participation in the academic processional in cap and gown were considered to be "a professional obligation" within the meaning of the Policy Manual. Both Professor Shaw and Professor Winn received copies of the notice which Dr. Stephens had distributed. When Dr. Stephens indicated to certain of the faculty leaders that he would attempt to open a dialogue between the Board of Trustees and the faculty relating to conditions of employment, the planned boycott of the 1972 commencement exercises was aborted.

In the following year, Dr. Stephens encouraged the formation of an organization of the faculty. He requested Professor Shaw to assume leadership of the organizing committee. The new faculty organization, tentatively called the Faculty Senate, commenced meetings on an *ad hoc* basis with Professor Shaw as its temporary chairman. Nineteen professional staff members signed the document entitled "Statement of Intention to Form a Faculty Senate." While Professor Shaw was one of the signers, Professor Winn was not. The statement provided in part:

"The purposes of this organization are: to provide an organization within which faculty self-governance can be restored at this college, and an organization through which a dialogue can be maintained with the administration of the college on matters of faculty welfare and professional development. *It is intended that this organization shall act and speak only for its members.*" (Emphasis supplied).

In the meantime, Dr. Stephens had inquired of the Attorney General of the State of Maryland, through the State Board for Community Colleges, regarding the legal right of the Board of Trustees of the College to engage in collective bargaining with the faculty. He received an oral opinion to the effect that state law did not permit the Board of Trustees to recognize any faculty group as an exclusive bargaining agent for the faculty. Although such right had been granted to the local Boards of Education in 1968 for public primary and secondary schools, exclusive collective bargaining agents were not allowed in the public community college system.[4] The import of the oral opinion of the Attorney General furthermore was that the Board of Trustees could enter into informal negotiations without permissive legislation.

At that time, there was a Chapter of the American Federation of Teachers, a Chapter of the American Association of University Professors, and a few members of the Maryland State Teachers Association present on the campus. It was apparently the intention of Dr. Stephens to attempt to coalesce the faculty into one localized organization which would present its negotiating requests and positions informally through him to the Board of Trustees. His announced position was that the proposed faculty organization should combine academic functions and responsibilities with staff professional welfare functions and responsibilities, a position with which many faculty members, including the plaintiffs, disagreed. Both plaintiffs, however, as well as most of the other faculty leaders, by March of 1973 were fully aware that Dr. Stephens, based upon an oral opinion of the office of the Attorney General, had announced to DISAC and others that there could not legally be an exclusive collective bargaining agent for the faculty.

In early March, 1973 Professor Shaw and Annie Kronk, Chairman of the Provisional Faculty Senate's Committee on the Constitution, met with Dr. Mitlehner to present the proposed constitution of the Faculty Senate. This draft document was not presented to the court.

4. Article 77, § 160, Md.Ann.Code (1975 Repl. Vol.) ; Laws of Maryland, 1968, Ch. 483.

Dr. Mitlehner reviewed the same and prepared his own version of a constitution and bylaws for the Faculty Senate, embodying the concepts which he believed would be acceptable to Dr. Stephens and the Board. This draft was presented at the DISAC meeting to the Division Chairmen on March 15, 1973. The "purpose" clause read as follows:

"The purpose of the organization is to provide a forum for the discussion of academic concerns and the formulation of recommendations for positive action on behalf of the membership. Such recommendations shall be submitted through the President of the Board of Trustees for its consideration."

At that meeting of DISAC, Dr. Stephens advised the Division Chairmen of the Attorney General's opinion and recommended that any discussion of negotiating rights await the close of the then current session of the Maryland Legislature.

In the meantime, Professor Shaw resigned as Chairman of the Provisional Faulty Senate. His reason for resigning, he testified, was that certain of the more radical members of the group were gaining too much power in the organization.

Subsequently, another draft of the proposed constitution of the Faculty Senate was prepared by unknown persons in the organization. The "purpose" clause of that draft read as follows:

"The purpose of this Senate is to provide an organization for faculty self-governance at Frederick Community College and to have the Senate or its designated agent recognized by the President and the Board of Trustees as the negotiating agent on matters of faculty welfare, professional development, and academic affairs."

At the DISAC meeting of April 12, 1973, Dr. Stephens again spoke to the Division Chairmen, including Professors Shaw and Winn, and urged them both "to support and encourage the faculty to develop [a faculty] organization."

On or about May 2, 1973, the last version of the proposed constitution of the Faculty Senate was prepared by unknown persons in the organization. The "purpose" clause of this draft reads as follows:

"The purpose of this Senate is to provide an organization for faculty self-governance at Frederick Community College and to have the Senate or its designated agent recognized by the President and the Board of Trustees as the negotiating agent under conditions of binding arbitration, on matters of faculty welfare, professional development, working conditions, and academic affairs."

This draft was not acceptable to Dr. Stephens.

Events began to move rapidly. A petition was circulated and signed by 36 of the 38 fulltime faculty members, including Professors Shaw and Winn. That petition stated:

"The AAUP, AFT and MSTA all support the Faculty Senate in obtaining collective bargaining for the Frederick Community College Faculty.

"We, the undersigned faculty members, demand that the Board of Trustees of Frederick Community College take action to grant this right at the May 16, 1973 meeting."

Under the signatures of Annie Kronk, representing the Faculty Senate and Ann Abeles, representing the college chapter of AFT, a notice was published on May 9, 1973, announcing a meeting of all faculty members and professional staff with designated academic rank to be held on May 15 for the purpose of discussing ". . . the issue of collective bargaining as it applies to F.C.C."

Professors Shaw and Winn were among the 21 members of the faculty who attended the meeting. A summary was circulated to the faculty of the re-

sults of the meeting.[5] The meeting passed a resolution, among others, which stated " . . . we will not meet any professional obligations until the Board grants negotiating rights." The strident tone of the meeting is exemplified by the adopted motion providing " . . . we will not leave [the Board of Trustees meeting] if the Board goes into executive session over our bargaining rights; and that we follow them if they leave." While no roll call was kept, there was substantial evidence before this court that Professors Shaw and Winn both spoke and voted against the concept of witholding professional services.

On the afternoon of May 15, Dr. Stephens became aware of the resolutions adopted by the 21 faculty members. He directed Dr. Mitlehner to meet with faculty leaders to outline the illegality of the action proposed and to attempt to alter the plans of the next day. Dr. Mitlehner was unsuccessful. Dr. Stephens then arranged a meeting for 8:30 a. m. on May 16 with Ann Abeles and Annie Kronk at which he told them that the proposed course of action would lead to grave consequences. They both stated that they had considered the consequences of their action and that they knew what they were doing.

In the meantime, at the request of the faculty, the faculty workshop which had been scheduled for the afternoon of May 16 was rescheduled for May 17 in order to allow the faculty members to attend the meeting of the Board of Trustees to be held on the afternoon of the 16th.

The meeting of the Board of Trustees took place as scheduled. Most of the faculty attended the meeting, overcrowding the room to the extent that a number of persons had to stand in the hallway. Annie Kronk and Ann Abeles were the primary spokesmen for the faculty. Mrs. Kronk addressed herself initially to requesting Board endorsement of the latest version of the constitution of the Faculty Senate, requesting that the proposed constitution be discussed in that session by the Board and that the decision be made at that meeting. Dr. Abeles presented the petition which had been signed by 36 of the fulltime faculty members " . . . and asked that the Board show its courtesy and confidence by agreeing to having the Maryland Department of Labor and Industry hold an election on the campus to determine the representative group to negotiate with the Board of Trustees."[6] Dr. Abeles stated that such a procedure had been followed in Allegany County where a precedent had been established that a

---

5. The summary stated in major part as follows:

"1. The FCC Faculty requests permission to be excused from the Wednesday, May 16 afternoon session of the Workshop in order to attend the meeting of the Board of Trustees at 2 PM Wednesday. We respectfully request that the workshop session be rescheduled for Thursday afternoon at 2 PM or Friday at 10 AM.

"2. Regardless of the decision on our request in motion 1 to attend the Board meeting, the full faculty will attend the Board meeting to demonstrate our solidarity toward this goal.

"3. We moved that we will not leave if the board goes into executive session over our bargaining rights; and that we follow them if they leave.

"4. We moved that we will not meet any professional obligations until the Board grants negotiating rights.

"5. We moved that we contact the part time teachers, the teachers at other local schools and colleges and the FCTA to tell them of our actions today and Wednesday and ask them to support us and not to take teaching jobs here if we are on strike.

"6. That we will meet again at 2 PM Thursday, May 17 at the home of Ann Abeles to discuss Summer School, the 12 month people and the case where the dean has bypasses (sic) the devision (sic) chairman and reassigned a course from a 10 month employee to a 12 month.

"The meeting adjourned with a statement by Ann Abeles demonstrating the support of all the faculty organizations for negotiating rights."

6. DX 19, Minutes of the Board Meeting of May 16, 1973.

Board of a community college could negotiate a memorandum of understanding with a representative group of employees.

Professor Shaw, although present, did not speak. Professor Winn expressed the opinion that the faculty felt like second-class citizens "after so much time has elapsed without tenure or negotiating rights."[7]

The chairman of the Board stated that there was a question of the legality of the proposal and that the Board had not seen the petition until just prior to the meeting. In response to a request by Dr. Abeles "that the Board take action to approve collective bargaining . . . ,"[8] the Board chairman stated that the "demand" of the petition implied a threat and that the Board would not operate under duress. Following a request that the petition be "placed face down on the table and that the Board consider the constitution,"[9] the Board recessed its open meeting and convened in executive session. After a short meeting in executive session, the Board reconvened in open session and issued the following statement:

"The Board will designate the Faculty Senate as the faculty representative if they will accept the following conditions:

"A. The faculty organization will represent on a continuing basis the majority of the faculty members

"B. The faculty organization itself will not directly be affiliated with an external association (this does not apply to individual members)

"C. Membership in the organization is not to be compulsory

"D. The designated faculty organization representatives and the administrative representatives will meet promptly to establish the specific procedures to be followed in developing a continuing dialog and submit this report to the Board of Trustees as soon as possible

"E. Certain aspects of the constitution as suggested are of concern to the Board."[10]

Annie Kronk then stated: "Because this response does not meet the faculty group demand, we will not meet any professional obligations until the Board grants negotiating rights."[11]

Mr. Bowers, the Board chairman, responded: "Do you understand the full implications of your action?" Mrs. Kronk replied that the group had given the matter "considerable thought and they did understand the consequences."[12]

The dissident faculty and staff members present, including Professors Shaw and Winn, reassembled immediately thereafter in a classroom. The mood of the meeting was volatile. Professors Shaw and Winn attempted to temper the mood of the more radical speakers when suggestions were made that the members strike, boycott graduation exercises, or picket the graduation exercises with placards. No definite plans were agreed upon and a meeting was scheduled for the next morning at the home of Ann Abeles at 8:30 a. m.

Professors Shaw and Winn attended the meeting at the home of Ann Abeles. Professor Shaw unsuccessfully attempted to contact Dean Mitlehner to tell him that he would meet his responsibility which had previously been assigned to him to pick up a visitor at the airport on the following day in connection with college business. At approximately 10 a. m., he spoke to his secretary by telephone from Dr. Abeles's home. He told her where he could be reached and instructed her to give a message to Dean

7. *Ibid.*

8. *Ibid.*

9. *Ibid.*

10. *Ibid.*

11. *Ibid.*

12. *Ibid.*

880

Mitlehner's office concerning his plans for the following day. At the request of Professor Winn, he also advised Professor Winn's secretary that Professor Winn could be reached at the home of Dr. Abeles.

At the meeting, Professors Shaw and Winn spoke in opposition to motions to boycott commencement exercises completely and in favor of performing summer school professional services. Professor Winn particularly stated that he would not engage in any "unlawful activity." It was resolved at the meeting that the faculty would attend the commencement exercises on May 20 but would not march in the academic procession in academic regalia nor sit in the section of the auditorium reserved for the faculty. A press release was prepared by Annie Kronk and Ann Abeles, which was distributed to the newspapers and read to Dr. Stephens. The press release provided in part as follows:

"The Frederick Community College Faculty is protesting their lack of negotiating rights by not appearing at a Faculty Workshop Thursday and by not appearing in academic regalia at Commencement on Sunday. We are not on strike but are publicly protesting a lack of negotiating privileges which the other county teachers have already been granted.

" * * *

"The Frederick Community College Faculty will continue its protest through Sunday, May 20, 1973. Recognizing the timetable imposed by the school calendar the faculty will continue to plan during the summer and will meet in the fall to take any action necessary and appropriate to achieve negotiating rights which the Board continues to deny the faculty.
" * * * " 13

Professor Shaw and Professor Winn were among the 30 faculty members who, without approved excuse, failed to attend the faculty workshop scheduled for May 17. Neither Professor Shaw nor Professor Winn reported to Dean Mitlehner or to Dr. Stephens the results of the faculty meetings of May 15, May 16, and May 17. Professors Shaw and Winn both agreed to participate in the "protest" at the Commencement.

On May 18, 1973, Dr. Stephens met informally with the chairman and several members of the Board. He advised them that a number of the faculty members had not attended the faculty workshop and that he understood that a large number of faculty members would not participate in the commencement exercises on May 20, 1973. He stated that he wished to advise the Board that he considered these actions to be failure to perform "professional obligations" and that he was considering recommending termination of those faculty members who did not meet their said obligations. The meeting was not intended to obtain Board approval for his action but was designed merely to advise the Board of the present situation and to inform the Board members of his intention.

On May 20, 1973, commencement exercises took place as scheduled. Twenty-nine members of the faculty, without prior approved excuse, failed to sit in the spaces in the auditorium reserved for the faculty and failed to march in the academic procession in academic regalia. Professors Shaw and Winn were among those faculty members who did not so participate. The protesting faculty attended the commencement and sat in a group in a section of the stands not reserved for them.

On or about May 22, 1973, Dr. Stephens sent notices to the protesting faculty members that termination of their employment was being considered. The professional administrative staff members, among them Winn and Shaw, received slightly different letters of termination than the other faculty members, corresponding to the sections of the Policy Manual which differentiated between

administrative personnel and professional instructional staff personnel. The notices to Professors Shaw and Winn stated in pertinent part as follows:

"This letter informs you that termination of your employment at Frederick Community College, as of June 30, 1973, is under consideration. This letter transmits the charges in writing within the prescribed thirty (30) day advance notice requirement, pursuant to Section 3.206–1 of the College Policy Manual.

"Charges:

"1. That on May 17, 1973, from 9:30 a.m. to 2:00 p.m., you deliberately, willfully, and in concert with other College personnel, failed and refused to attend a faculty workshop, in violation of Section 3.203–2–c of the College Policy Manual.

"2. That on May 20, 1973, from 8:00 p.m. to 9:00 p.m., you deliberately, willfully, and in concert with other College personnel, failed and refused to participate in the Commencement Exercises, in violation of Section 3.203–2–c of the College Policy Manual.

"3. That, by the actions specified above, you have publicly repudiated the stated objectives, purposes, policies, rules and regulations of Frederick Community College, and have failed and refused to support them as required by Section 3.203–1–c of the College Policy Manual."

On May 31, 1973, Walter S. Levin, Esq., an attorney, notified the college that he represented all but one of the faculty members who had received the notices of termination, including Professors Shaw and Winn. Mr. Levin had been present at the meeting on May 17, 1973 at the home of Ann Abeles.

Pursuant to the procedures set forth in the Policy Manual, all of the profes-

sional instructional staff personnel, through Mr. Levin, requested a hearing before a review committee as set forth in § 3.309–1b3. Several hearings were conducted in early June by the review committees.[14]

Dr. Stephens believed that his decision as to the ultimate recommendation made in each case was required to be made by June 30, for the so-called 12-month faculty and by a date in August for the so-called 10-month faculty. All of the professional administrative staff except for Mr. Loya were 12-month faculty members. Therefore, Dr. Stephens agreed with Mr. Levin that the hearings for the 10-month faculty members would be suspended in order to allow concentration on resolving his recommendations as to the 12-month faculty members by June 30.

Dr. Stephens solicited from all of the protesting faculty members a letter explaining their action, and stated that he would meet with any faculty member who chose to meet with him.

On or about June 16, 1973, Mr. Burgow, a faculty member, met with Dr. Stephens in his office. He presented a letter to Dr. Stephens in which he explained that he recognized that his actions were wrong and that he had been neglectful of his professional responsibilities, further stating that he would not engage in such conduct in the future. On the basis of his discussion with Mr. Burgow and his letter, Dr. Stephens agreed to dismiss the termination proceedings against him.

A few days later, Mr. Levin and Mr. Burgow met with Dr. Stephens to inquire whether he would consider reinstatement of the other faculty members on conditions similar to that extended to Mr. Burgow. Dr. Stephens indicated that he would and a discussion ensued concerning the conditions for reinstate-

14. The review committees were composed of one member of the faculty selected by the faculty member who was a subject of the charge, one faculty member selected by the division chairman of the charged faculty member, and one faculty member selected by the Dean for Instructional Services. The review committee was required to make a recommendation to the President as to the disposition of the charge.

ment. The conditions required were that each faculty member must recognize and acknowledge that his or her action was a neglect of professional duties, that each must promise not to participate in such action in the future, and that each must agree that the Policy Manual was the basis upon which the college would be run. These were essentially the same conditions under which Dr. Stephens had promised to reinstate Mr. Burgow. Dr. Stephens and Mr. Levin, at this meeting, agreed upon the concept of a type of form letter which could be executed by each faculty member seeking reinstatement. A draft of the letter was later prepared by Dr. Stephens, in consultation with Charles Price, an attorney for the college, and submitted to Mr. Levin. Certain amendments were suggested by Mr. Levin and were later accepted by Dr. Stephens. At about this same time Mr. Levin proposed to Dr. Stephens that the involved faculty members, including administrators, would all sign the form letter provided that Dr. Stephens agreed to drop all of the charges against them as a group. Dr. Stephens rejected this proposal and told Mr. Levin through the college lawyer, Mr. Price, on June 19, 1973, that he would require an individual conference with each member of the faculty in order to insure that they were sincere in their representations in the form letter.

On June 20, 1973, the Board adopted a resolution which provided in part as follows:

"* * * *

"As in the past, the administration of the college is prepared to meet and discuss matters of mutual interest with any staff member or staff groups.

"As in the past, whether or not members of the college staff wish to join a union or association is not a matter of Board or administration concern.

"As in the past, the college Policy Manual shall serve as the official statement of working conditions and responsibilities at the college. Changes in personnel policies included in the manual shall not be undertaken without prior discussion with all staff members affected.

"* * * *"15

On June 21, 1973, one of the first so-called form letters was signed by Richard F. Thompson, a faculty member. This letter was the product of a meeting between Mr. Thompson, Dr. Stephens, and Mr. Levin. On June 26, Dr. Stephens formally notified Mr. Burgow by letter that he was dismissing charges against Mr. Burgow based upon Burgow's initial letter of June 16.

According to the testimony of both Dr. Stephens and Dr. Mitlehner, at a conference held sometime prior to June 26, Dr. Stephens told Mr. Levin in the presence of Dr. Mitlehner that the so-called form letter would be available to all members of the faculty, including administrators, but that Dr. Stephens would require that each person desiring to sign the letter have a personal conference with him. Subsequently, Mr. Campbell, a professional administrative staff member, met with Mr. Levin, Dr. Stephens, and Dr. Mitlehner on June 26, 1973, and signed his form letter with a minor change on June 29, 1973. Mr. Price also testified that he told Mr. Levin on June 19, 1973, that the form letter procedure would be available to "all or any of his clients individually, but not as a group." There was no testimony that Mr. Levin was advised by Dr. Stephens or any other college representative that the form-letter procedure would be unavailable to professional administrative staff members such as Professors Shaw and Winn.

On June 26, Annie Kronk, an Assistant Librarian who qualified as a member of the administrative staff as set forth in the Policy Manual, met with Dr. Stephens in the company of Mr. Levin. At that meeting she indicated that she

would not sign the proposed form letter. On June 29, she met again with Dr. Stephens and delivered a letter to him adding certain additional statements to a letter which she had previously sent on June 18, 1973. This letter, later referred to as the "Annie Kronk type letter," stated in pertinent part as follows:

"I did not meet my assigned responsibilities on May 17, 1973, and May 20, 1973.

"Additionally, I agree that work stoppage is not the proper way to resolve disputes at Frederick Community College.

"Further, I accept, with full understanding of the Board's statement of June 20, the Policy Manual as the official statement of working conditions at the present time, but I believe that the Policy Manual should not be revised unilaterally during the contract year.

"I hope, Dr. Stephens, that this statement, combined with my statement of June 18, will be sufficient for you to make a just decision in my case, considering my previous good record at the College."[16]

On June 30, Dr. Stephens terminated the proceedings against Annie Kronk.

When Professor Shaw had received his letter of May 22, 1973, he thought about going to see Dr. Stephens but did not do so. He sought counsel from Mr. Levin who was then counsel to the Maryland State Teachers Association and decided to place himself completely in the hands of Mr. Levin. On June 13, 1973, Dr. Stephens wrote to Professor Shaw to request that he submit any statement to Dr. Stephens prior to June 18, 1973 and solicited a personal conference with him. On June 14, 1973, Professor Shaw delivered to Dr. Stephens's office a letter which set forth his activities on behalf of the college but did not directly refer to the activities of May 17, 1973 or May 20, 1973. Dr. Stephens found the letter unacceptable for that

reason. On June 29, 1973, Professor Shaw received a call from Dr. Mitlehner who asked him to meet with Dr. Stephens at 2:15 p. m. on that day. Professor Shaw was aware that Dr. Stephens had met with others on that day and had indicated to at least one that he would recommend dismissal to the Board of Trustees. When Professor Shaw entered the office, Dr. Stephens asked him to sit down and discuss the matter which Professor Shaw declined to do. Apparently convinced that Dr. Stephens was going to fire him, he requested that Dr. Stephens give him the dismissal letter if he was going to do so. Dr. Stephens then gave the letter to Professor Shaw which he had had typed up for all the administrators in the event that they did not comply with the form letter principles.

Professor Shaw composed a letter dated June 29, 1973[17] to Dr. Stephens which essentially set forth Shaw's willingness to accept the conditions which had previously been stated by Dr. Stephens for termination of dismissal proceedings. However, on the advice of his counsel, Mr. Levin, Shaw never delivered nor communicated the letter to Dr. Stephens. Shaw testified that his recollection was unclear as to whether the letter had been written the day before he visited Dr. Stephens's office or whether it had been written on the day of the visit. The language of the letter was essentially the same as the "Annie Kronk type letter."

On July 1, 1973, Professor Shaw drafted another letter in essentially identical terms as were contained in the "Annie Kronk type letter" except that he substituted the word "protest" for the words "work stoppage." This letter was delivered to the office of Dr. Stephens on July 2, 1973. The letter was later returned to Professor Shaw by Dr. Stephens with the explanation that it had arrived too late, that the matter was in the hands of the Board of Trustees,

16. PX 14.

17. DX 14.

and that the letter should be brought to the Board's attention.

Upon receipt by Professor Winn of his letter of May 22, 1973 from Dr. Stephens, he, as in the case of Professor Shaw, decided not to go to see Dr. Stephens directly, but to act through Mr. Levin as his counsel. On June 12, 1973, Professor Winn wrote to Dr. Stephens. In his letter, he attempted to justify his actions of May 17 and May 20, stating in part as follows:

" * * *

"I did not believe the actions of May 17 or May 20 were illegal. A mere protest, not causing student injury, was far more preferable to me than a loss of faculty rights to affiliate with a professional organization.

" * * *

"Of course, I was aware of past incidents of absences from workshops, staff meetings, committee meetings, and other comparable activities. Such knowledge gave me no indication that absence would result in dismissal proceedings. However, let me say that I do not sanction indiscriminate absence from such affairs.

" * * * "18

On June 21, prior to leaving town to attend a convention, Professor Winn prepared a short statement which he gave to Mr. Levin to use in his discretion. That statement referred to the Board action of June 20, 1973, but did not specifically refer to the events of May 17 and May 20. In part, Professor Winn's statement provided:

" * * *

"I would not resort to illegal methods to foster the above ideas and will strive to completely abide by the rules and regulations of the college during the coming year.

" * * * "19

Professor Winn returned from the convention late on June 27, 1973. He met with Dean Metlehner at which time the concept of the form letter was discussed. Professor Winn said that he could not bring himself to admit that he had "neglected" his duty on May 17 and May 20, this being the term which had been included as a description of the events of May 17 and May 20 in the early versions of the form letter.

On the afternoon of June 29, 1973, Dr. Stephens met in his office with Professor Winn in the presence of Dean Mitlehner. Professor Winn gave Dr. Stephens a copy of his statement of June 21, which contained no direct reference to the events of May 17 and May 20. Dr. Stephens told Professor Winn that the statement was not acceptable because it contained no overt acknowledgment that the actions of May 17 and May 20 were improper and in violation of the Policy Manual. Professor Winn stated that he could not bring himself to admit that he had neglected his duty. Dr. Stephens instructed Professor Winn to leave his office to reflect upon the conditions which Dr. Stephens insisted be a part of any letter from Professor Winn before he would terminate dismissal proceedings.

Professor Winn left the office of Dr. Stephens and saw Annie Kronk who was then reading to Mr. Levin over the telephone the "Annie Kronk type letter." Annie Kronk told him that Dr. Stephens had indicated to her that this type letter would be acceptable to him as a basis for his termination of dismissal proceedings against her.

Approximately an hour later, Professor Winn returned to the office of Dr. Stephens. He did not tell Dr. Stephens that he would sign any further letters nor did he discuss with him the "Annie Kronk type letter." Dr. Stephens handed to Professor Winn a letter which had previously been prepared stating that Dr. Stephens was recommending the termination of Professor Winn's employment.

18. PX 75.

19. PX 77.

On July 1, 1973, Professor Winn composed a further letter to Dr. Stephens. The letter stated:

"I am still attempting to objectively think through this trying situation, keeping in mind your comments of Friday, June 29.

"Honestly, I was unaware of the condition that you pointed out—namely, that I had written reasons for not attending the college activities referred to, but not an explanation as to why I did not attend.

"\* \* \*

"As I mentioned during our meeting, I did not meet the responsibilities assigned on the days of May 17 and May 20, 1973. I will do my best to abide by the rules, regulations, and working conditions of the college which, I understand, include such contract which I may receive and the Policy Manual in effect for the period specified.

"I hope that you are aware of the fact that I believe that work stoppage is not the proper way to resolve employer-employee disputes at Frederick Community College or elsewhere in the public sector.

"*If it is not too late* I will appreciate your consideration of this communication, along with my past performance at the college in arriving at a just decision in my case.

"\* \* \* \*"

(Emphasis supplied). [20]

The letter was delivered to the office of Dr. Stephens on the morning of July 2, 1973. Professor Winn, upon later being advised by Dr. Stephens that the matter was in the Board's hands, forwarded it to the Chairman of the Board on July 12, 1973, stating:

"This letter was written as an outcome of my brief discussion with [Dr. Stephens] on June 29, but honestly reflects my position prior to that time." [21]

When the June 30 deadline expired, five members of the professional administrative staff had not furnished letters to Dr. Stephens encompassing the principles of the agreed upon form letter. Dr. Stephens recommended to the Board that these five administrators be dismissed from employment.

The Board of Trustees held hearings before panels of three of its members for the purpose of assembling the information relevant to the consideration of the charges in each case. On July 16, 1973, a panel consisting of Board members Gardiner, Bowers, and Hodgson held a hearing concerning Bilarsky, Prescott, and Driscoll. On July 17, 1973, a panel consisting of Board members Smith, Barnes, and Remsburg held a hearing concerning Shaw and Winn. Professors Shaw and Winn were represented by Mr. Levin. Although the hearings were not public, a representative of MSTA was allowed to be present. Transcripts were made of the testimony taken at each hearing.

At Mr. Levin's request, oral argument was scheduled before the full Board on August 15, 1973. Prior to oral argument, all Board members had read the transcripts of the testimony taken in the panel hearings.

The Board met on August 16, 1973, in executive session to consider the four cases then remaining, one administrator having resigned in early August. As an alternative to considering dismissal of the charged administrators, the Board agreed to offer each of them a contract of employment for one year with the requirement that they perform work off campus, except in the case of Miss Prescott, who was to work in the library. No decision was made as to final disposition of any of the cases at the Board meeting of August 16.

On August 21, 1973, a meeting was held in the library of the college to discuss the offer which had previously been communicated to each of the four ad-

---

20. PX 79.

21. PX 81.

ministrators involved. Those attending the meeting were Shaw, Winn, Bilarsky, Prescott, Kronk, and Levin. As a result of this meeting, Bilarsky and Prescott agreed to accept the offer, Shaw declined the offer, and Winn stated that he wished to deliberate further.

On August 22, 1973, the Board of Trustees met again to consider the case of Professor Shaw. After deliberation in executive session with only Board members present, the Board voted to dismiss Shaw. This decision was embodied in a written opinion later drafted by Mr. Price and executed by each member of the Board except Mrs. Ashbury who abstained because of the fact that she had only recently been appointed to the Board.

Professor Winn eventually declined to accept the one year contract. The Board met in executive session on September 12, 1973, to consider his case. After deliberation in closed session, the Board voted to dismiss Professor Winn. This decision was embodied in a written opinion later drafted by Mr. Price and executed by each member of the Board except Mrs. Ashbury.

■■■ The jurisdiction of this court over this action is manifest. The state and local government involvement in the operation of the Frederick Community College subjects it to the obligations imposed by the Fourteenth Amendment and will sustain federal jurisdiction of a claim of denial of procedural or substantive due process as guaranteed by such amendment. Kota v. Little, 473 F.2d 1 (4th Cir. 1973); 28 U.S.C. § 1343(3), and 42 U.S.C. § 1983. Where a public college faculty member has tenure, as in the case of Professor Shaw, or a legitimate claim of entitlement to continued employment in the absence of just cause, as in the case of Professor Winn, procedural and substantive due process must be provided before employment may be terminated. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). As to the allegations of the complaint that the actions against them were retaliation by the college against activity on the part of the plaintiffs protected by the First Amendment, jurisdiction unquestionably lies. Perry v. Sindermann, *supra;* Chitwood v. Feaster, 468 F.2d 359 (4th Cir. 1972); 28 U.S.C. §§ 1331 and 1343(3), and 42 U.S.C. § 1983.

■■■ As to the First Amendment claim, the court finds that the termination of the employment of plaintiffs was a result of their failure to perform the conditions of employment contained in the Policy Manual of attending the workshop on the 17th of May and of participating in the commencement exercises on the 20th of May. While the plaintiffs had a constitutionally protected right under the First Amendment to disagree with the policies of the Board and the administration of the Frederick Community College, they had no such right to evidence their disagreement by failure to perform the duties imposed upon them as a condition of their employment. "A college has a right to expect a teacher to follow instructions and to work cooperatively and harmoniously with the [President]." Chitwood v. Feaster, *supra,* at 361. While a public college faculty member must be free to exercise his right to speak on issues of public importance without fear of dismissal from his employment, no similar guarantee exists to encourage actions on his part which entail failure by him to perform duties reasonably and regularly required to be performed by him as a part of the responsibilities of a faculty member. *See* Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). No suggestion has been made in this case that it was somehow unreasonable for the rules of the college to require the attendance of faculty members at faculty workshops or to require that they march in academic regalia at commencement exercises. In the context of a wholesale refusal by faculty members to perform their duties,

even though such duties were relatively minor when considered against the total spectrum of faculty responsibility, the actions of two Division Chairmen in joining such activities not only contributed to disruption of legitimate college functions, but justified the President in requiring from administrators such as the plaintiffs unequivocal admissions of the impropriety of their prior conduct in order to attempt to prevent such mass actions in the future.

■ Plaintiffs claim that they were denied procedural due process. Undoubtedly, procedural due process required that they have an opportunity for a hearing prior to a final decision upon the termination of their employment. Board of Regents v. Roth, *supra;* Perry v. Sindermann, *supra.* No procedural due process right exists, however, as is claimed by plaintiffs, to a *public* hearing by the Board. Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). A transcript was maintained which would vindicate whatever interests the plaintiffs would have in a hearing under the circumstances present here to which members of the public in general would have been invited. Neither does due process require testimony under oath in the circumstances here. Grimes v. Nottoway County School, 462 F.2d 650, 653 (4th Cir.), cert. denied, 409 U.S. 1008, 93 S.Ct. 439, 34 L.Ed.2d 300 (1972).

■ Plaintiffs have further alleged that the Board improperly received *ex parte* information concerning the cases of Professors Shaw and Winn and formulated judgments as to the merits of the cases prior to the time they were called upon to make a decision pursuant to the hearing procedure. The proposition that due process requires a fair hearing before an impartial tribunal is well established. Gibson v. Berryhill, 411 U.S. 564, 578–79, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) ; Johnson v. Mississippi, 403 U.S. 212, 216, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971). This rule, however, cannot be utilized in the normal circumstances to disqualify all members of the tribunal to make it impossible for the tribunal to carry out its lawful function. Duffield v. Charleston Area Medical Center, Inc., 503 F.2d 512 (4th Cir. 1974). *See also* Withrow v. Larkin, *supra.* The mere fact that some of the members of the Board had been advised by the President in generalities of the actions which he expected to take is not sufficient to disqualify the Board from acting. *Duffield, supra,* at 518–519. The court rejects the allegations of bias and personal animosity on the part of Chairman Bowers against plaintiffs Shaw and Winn, and the court finds as a fact that the chairman had no such bias or animosity.

Between the time of the Shaw and Winn hearings before the Board panel and the time of the respective decisions of the Board in reference to the Shaw and Winn dismissals, Dr. Stephens did not communicate to the Board *ex parte* any alleged facts directly relating or referring to the merits of the cases then pending against Shaw and Winn. While the Board sought an alternative to acting upon the charges against Professors Shaw and Winn, that fact did not disqualify them from later acting upon the merits of the charges when they learned that the alternative which they had offered was not acceptable to Professors Shaw and Winn.

■ Plaintiffs also argue that their procedural due process rights were violated by virtue of the fact that the Board considered information that many of the other faculty members had signed the form letters, or letters encompassing conditions in the form letter, whereas Professors Shaw and Winn had not done so until after their dismissals had already been recommended by the President. That information, unchallenged in its veracity, was known to the Board as general information which became available to it in the exercise of its responsibilities in guiding the conduct of the affairs of the college. It did not directly bear upon the issue of whether or not

Professors Shaw and Winn did, in fact, perform the acts which formed the basis of the charges against them, but only related to the circumstances under which the charges against those faculty members who had signed were dismissed without formally being brought before the Board. Due process is not so rigid a concept as to require the Board members to bury their heads in the sands, ignoring facts generally known to them by virtue of their positions as Board members, but also known in August and September, when the decisions were made, to the college community in general. Withrow v. Larkin, *supra.*

◼ Plaintiffs have attempted to paint a picture in broad brush that Mrs. Hodgson, Mr. Barnes, and Mrs. Remsburg had decided irrevocably prior to the Shaw and Winn hearings that their employment should be terminated. Even where board members are exposed to evidence presented in non-adversary investigative procedures instituted by the board, that fact alone " . . . is insufficient in itself to impugn the fairness of the board members at a later adversary hearing. Without a showing to the contrary, state administrators 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.' United States v. Morgan, 313 U.S. 409, 421, 61 S.Ct. 999, 85 L.Ed. 1429 (1941)." Withrow v. Larkin, *supra,* 421 U.S. at 55, 95 S.Ct. at 1468. Furthermore, in the present case, all Board members categorically denied that they had discussed the merits of the charges against Shaw and Winn among themselves or with Dr. Stephens in an *ex parte* fashion prior to the adversary hearings for Shaw and Winn or between the time of those hearings and the time when they entered their respective decisions as a Board on the two cases. This court credits their testimony in that respect. The fact that some of them held the view that persons in the administrative capacities of Professors Shaw and Winn had a particu-

larly strong obligation to obey the reasonable rules and regulations of the college set forth in the Policy Manual and that, in the absence of a timely admission by Shaw and Winn of error, their uncontroverted failure to participate in the required way in the workshop and the commencement exercises justified their dismissal, does not constitute, in this court's view, such a closed mind and prejudgment of the issues as to prevent their action on the charges in accordance with the responsibilities imposed upon them as Board members. The only real issue of fact before the Board in the cases of Shaw and Winn was not whether they had failed to participate in the required way, but whether, in the case of the faculty workshop, they had intentionally boycotted the workshop as opposed to having incidentally missed the workshop while attempting to dissuade the faculty members at the home of Ann Abeles from further violations of the obligations imposed by the Policy Manual, and, in the case of both the workshop and the commencement exercises, whether they could be counted upon in the future as administrators to set an example by not engaging in such conduct again. The plaintiffs have not met their burden to establish by a preponderance of the evidence that any Board members were unable, through immutable preconceptions on their part, to decide those issues fairly based upon the evidence at the hearings and the argument made before them on August 15, 1973, by Mr. Levin and Dr. Stephens.

◼ As to plaintiffs' argument that there was a violation of procedural due process by virtue of the fact that Mr. Price, counsel to the college, had consulted with Dr. Stephens and advised him on procedures and had later performed similar functions for the Board and still later had prepared the opinions to implement the Board's decisions in the cases of Shaw and Winn, the court finds no merit. No evidence exists that Mr. Price in any way influenced the ultimate decisions of the Board members on the

merits of the charges against Professors Shaw and Winn.

 Plaintiffs further contend that substantive due process was, denied them. As to this aspect of the case, it is important to note that the function of the court is limited to determining whether the actions of the Board denied plaintiffs of "liberty" or "property" without due process of law in violation of the Fourteenth Amendment to the Federal Constitution. Board of Regents v. Roth, *supra;* Perry v. Sindermann, *supra.* The court, in deciding the substantive due process claim, is not determining whether the evidence adduced against Shaw and Winn met the evidentiary standards required under state or local administrative procedures or statutes but is, on the. contrary, applying solely a federal constitutional standard. While the court must consider only the facts and logic relied upon by the Board itself, Johnson v. Branch, 364 F.2d 177, 181 (4th Cir. 1966), cert. denied, 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967), the court may not usurp the discretionary power of the Board and must uphold its action if the record contains any objectively substantiated facts to support the Board's action. *Id.* In this case the Board had before it ample evidence that Professors Shaw and Winn, themselves administrators, banded with other members of the faculty to boycott the scheduled faculty workshop on May 17 and to disobey the previous instructions concerning participation in the commencement exercises on May 20. They had evidence before them of the strident memorandum of May 15 containing the results of the faculty meeting of that date,[22] as well as of the attitudes of Shaw and Winn that "protests" of the type engaged in, while not to be undertaken frequently, could be undertaken "judiciously."[23]

court that their intention in attending
Although Professors Shaw and Winn both argued to the Board and to this

the meeting at the home of Ann Abeles was to attempt to act as a moderating influence on the more radical faculty members, the Board was not required to accept their explanation. The evidence here and before the Board is that they attended the faculty meeting of May 15, that they attended the Board meeting of May 16 and did not openly dissent from the concluding statement of Annie Kronk at that meeting, that they attended the meeting of May 17 of the faculty from which emanated the press release, that they did not attend the faculty workshop nor participate in the required manner at the commencement exercises, and that they later wrote letters to Dr. Stephens which, rather than recognizing the impropriety of their actions, indicated that the "protests" were proper. One who looks like a rogue, acts like a rogue, and associates with rogues, cannot complain if he is found to be a rogue.

 The plaintiffs have suggested that substantive due process has been denied them in that, they argue, the sanction imposed upon them by the Board was excessively harsh. As to that argument, this court holds that it is not the function of the court, in the guise of enforcing constitutional standards, to supplant the discretionary authority of state administrative bodies in the administration of their personnel policies regarding administrative level personnel. While an egregious case of extreme inconsistency between the triviality of the act and the severity of the punishment for the act might justify the inference that the punishment was, in fact, imposed for some reason other than the stated one, the harshness of the punishment in and of itself does not justify a federal court to intervene. While some language of the court's opinion in Johnson v. Branch, 364 F.2d 177, 182 (4th Cir. 1966), cert. denied, 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967), might support the proposition that a harsh punishment in and of itself can be

---

22. PX 90b, pp. 247–249.

23. PX 90b, pp. 260–261, 275; PX 90c, pp. 364–365.

considered constitutionally arbitrary and capricious, this court reads that case to have decided that the Board's action in that case was *solely* motivated by the black plaintiff's involvement in civil rights activities rather than by the infractions of school rules which the board found or used as a pretext for the infliction of the punishment. In Drown v. Portsmouth School District, 451 F.2d 1106 (1st Cir. 1971), the court, while in *dictum* accepting the proposition that punishment for so-called trivial actions might be arbitrary, denied relief for the teacher who had not been rehired based upon her uncooperativeness, disregard of schedules, and failure to accept direction, stating that the degree of punishment " . . . is indeed a delicate judgment, and a court would be loathe to interfere except in egregious cases." 451 F.2d at 1108.

In the present case, this court is unable to characterize the rule infractions which were the stated basis of the Board's actions to be of so insubstantial a character under the circumstances and so unrelated to plaintiffs' duties as division chairmen as to be trivial in comparison to the harshness of the punishment, creating reason to believe that their dismissal was for some impermissible and unstated reason.

This court further finds that there was no denial of equal protection of laws. While other faculty members were allowed to sign the form type letters after June 30, 1973, resulting in the termination of proceedings against them, none of those faculty members were 12-month administrators in the class of Professors Shaw and Winn. Since the new school year for 12-month administrators commenced on July 1, there was a rational reason for establishing a different deadline for persons in the class of Professors Shaw and Winn than for other faculty members. This court furthermore finds no other basis for concluding that the plaintiffs were denied equal protection of the laws.

Lastly, the plaintiffs contend that they were denied the right of freedom of association, guaranteed by the First Amendment. The court does not agree. No action of the Board prohibited the plaintiffs or their peers from joining any association or organization which they chose to join.

In summary, the court finds no constitutional infirmity in the actions taken by the Board in reference to the cases of Professors Shaw and Winn. Whether the court agrees with the decision of the Board or not is not the test. The responsibility for conducting the affairs of Frederick Community College rests in its Board of Trustees and not in the federal court. While the court cannot resist the temptation to express a feeling of unfairness as to the dismissal of Professors Shaw and Winn while other more vocal advocates of precipitous faculty action were allowed to remain, Professor Shaw himself put it well when he said "When one steps out of line, he had better be ready to accept the consequences of stepping out of line."[24] For these reasons judgment will be entered for the defendants with costs.