John L. STEBBINS, Jr., Plaintiff,

v.

John C. WEAVER and Board of Regents
of the University of Wisconsin
System, Defendant.

No. 72–C–111.

United States District Court,
W. D. Wisconsin.

June 3, 1975.

John S. Williamson, Jr., of Goldberg, Previant & Uelmen, Milwaukee, Wis., for plaintiff.

Betty R. Brown, Asst. Atty. Gen., Bronson C. LaFollette, Atty. Gen., Madison, Wis., for defendant.

JAMES E. DOYLE, District Judge.

This is a civil action for declaratory and injunctive relief. Jurisdiction is invoked pursuant to 42 U.S.C. § 1983. The amount in controversy is alleged to exceed ten thousand dollars exclusive of interest and costs.

Plaintiff seeks a declaratory judgment holding that, both as to form and result, the procedures by which he was denied tenure as a member of the faculty of the University of Wisconsin-Milwaukee violated the due process clause of the Fourteenth Amendment of the United States Constitution. He further seeks injunctive relief reinstating him as an assistant professor, and barring the defendants both from denying him tenure without awarding him a hearing procedure comporting with constitutional requirements and from filling any tenured positions in the Mathematics Department of the University of Wisconsin-Milwaukee until such time as a final decision regarding the plaintiff's tenure is reached by means of a constitutionally adequate decision-making process.

Defendants have moved to dismiss this action on the grounds that this court lacks jurisdiction over the subject matter and that the complaint fails to state a claim upon which relief can be granted. It is to this motion that this opinion and order are addressed.

For the purpose of this motion, I take as true the allegations of the complaint, construed liberally to the plaintiff. Those allegations are summarized in the following section of this opinion headed "Facts."

### Facts

Plaintiff is a Wisconsin resident. Defendants Weaver, President of the University of Wisconsin System, and the Board of Regents of the University of Wisconsin System are legally empowered to govern and manage public higher education in Wisconsin, and to appoint professors at the University of Wisconsin-Milwaukee. In 1965 plaintiff was retained by the predecessors of the defendants as an assistant professor in the Mathematics Department of the University of Wisconsin-Milwaukee pursuant to a three-year contract. At the time of his appointment, the plaintiff was informed that with normal development in the areas of teaching, research, and community service he could expect to obtain tenure. During the ensuing six years the plaintiff enjoyed an extremely successful teaching career, was productive both in terms of academic publishing and community service, received a second three-year contract at the conclusion of the first three years, was awarded merit salary raises, and was assigned expanded duties.

In January of 1970, however, the Executive Committee of the Department of Mathematics met and voted to terminate plaintiff's faculty appointment. Plaintiff was not notified of the meeting, nor given an opportunity to be heard, nor allowed to confront the witnesses against him, nor permitted to submit to the Committee copies of his professional works or a record of his accomplishments.

On July 6, 1970 the Executive Committee met again, and took a position on the reasons for which the plaintiff was de-

nied tenure: (a) his research was not such as to warrant promotion; and (b) his area, namely, complex analysis, was adequately covered by tenured faculty in the Department. Again the plaintiff was not given an opportunity to be present at the Committee's meeting. Four months later, the Committee voted to promote and to award tenure to an assistant professor, other than plaintiff, who was also untenured and who had the same research specialty. Because the conduct and decisions of the Executive Committee were repeatedly disapproved by the Dean of the College of Letters and Science, the Executive Committee became hostile toward plaintiff.

In March of 1971, the Executive Committee held hearings on the issue of reopening its earlier decision regarding the plaintiff's tenure status. After four days of hearings, during which the plaintiff was given an opportunity to present information concerning his qualifications the Committee voted to allow their original decision to stand, thus denying the plaintiff tenure status and effectively terminating his employment at the University. Two of the committee members who participated in the vote on whether the plaintiff's case should be reopened did not attend the "substantive portions of the hearings." The Committee refused plaintiff's request that its decision be based solely on the evidence adduced at the hearing. The Committee refused to disqualify from participation in the hearing or subsequent vote members who had participated in the earlier decision then under review. Plaintiff was not allowed to examine Committee members as to the evidence upon which they had made their earlier decisions to deny him promotion. The Committee refused to state in writing the evidence upon which it based its determinations. No information unfavorable to the plaintiff

was presented at the hearing. Information overwhelmingly favorable to the plaintiff was presented at the hearing.

The plaintiff then appealed both alleged procedural errors by, and the substantive decisions of, the Executive Committee to the Dean of the College of Letters and Science of the University of Wisconsin-Milwaukee, then to the University of Wisconsin-Milwaukee University Committee, then to the defendant Weaver, and finally to the defendant Board of Regents. Each reviewing agency or person allowed the decision of the Executive Committee to stand.

## *Opinion*

### I. *Jurisdiction*

#### A. *28 U.S.C. § 1343(3).*

■ Defendant Weaver argues that this court lacks subject matter jurisdiction over this suit against him, as he is being sued in his "official capacity" and is therefore not a "person" within the meaning of 42 U.S.C. § 1983.[1] I hold that defendant Weaver is a "person" for the purpose of § 1983 regardless of whether he is being sued in an individual or official capacity.

■■ Since *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), it has been clear that state officials charged as individuals with unconstitutional activity are amenable to suit under 42 U.S.C. § 1983. Federal jurisdiction may also be exercised through § 1983 to redress constitutional wrongs " . . . through requiring appropriate official acts by officials sued in their representative capacities." *Harkless v. Sweeny Independent School District,* 427 F.2d 319, 323 (5th cir. 1970). The Supreme Court has frequently permitted relief under § 1983 against state officials

---

1. It may be that only a § 1983 cause of action can provide a federal court with subject matter jurisdiction under § 1343(3). See *City*

*of Kenosha v. Bruno,* 412 U.S. 507, 511–513 (1973); The Supreme Court, 1972 Term, 87 Harv.L.Rev. at 254, footnote 15.

sued in this representative capacity.[2] See, e. g., *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Although the distinction between a suit against a state official individually and one naming that same defendant in an official capacity may be relevant to issues of constitutional or common law immunity (see the following section of this opinion), it is immaterial to the definition of the term "person" in § 1983. Defendant Weaver is a "person" under § 1983, and subject matter jurisdiction over the suit against Weaver is present under 28 U.S.C. § 1343(3).

The defendant Board of Regents also contends that this court lacks subject matter jurisdiction in this suit against it, arguing that state agencies are not "persons" for the purpose of § 1983. It is true that other circuits have held state agencies in general and educational institutions in particular to be outside the scope of § 1983. See, e. g., *Whitner v. Davis*, 410 F.2d 24 (9th cir. 1969); *Blanton v. State University of New York*, 489 F.2d 377 (2nd cir. 1973). The law of the Seventh Circuit, however, is quite clearly to the contrary. In *Lee v. Board of Regents of State Colleges*, 441 F.2d 1257 (7th cir. 1971), a state agency similar to the present Board was held to be a "person" for the purpose of 42 U.S.C. § 1983. See also *Roth v. Board of Regents of State Colleges*, 310 F.Supp. 972, 974 (W.D.Wis.1970), *aff'd* 446 F.2d 806 (7th cir. 1971) *rev'd* on other grounds, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

The defendant Board argues that these Seventh Circuit decisions were implicitly overruled by the Supreme Court's decisions in *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973) and *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). In *Moor*, elaborating on its holding in *Monroe v. Pape, supra*, the Court held counties not to be "persons" for the purposes of § 1983. *Bruno* established that municipalities were not "persons" under § 1983 irrespective of the relief requested in any action brought against them. The defendant argues that a state agency is a "political subdivision" of the state, and therefore no more subject to suit under § 1983 than are cities and counties. See *Moor*, 411 U.S. at 693, 93 S.Ct. 1785.

The *Monroe, Moor,* and *Bruno* decisions were exercises in statutory interpretation. In each case the Court turned to the legislative history of § 1983 to find an explicit intent to exclude cities and counties from the scope of that statute. The decision to exclude "municipalities" from the reach of § 1983 was prompted by a fear on the part of influential House members that Congress lacked "the constitutional power to impose liability" upon such entities. *Moor*, 411 U.S. at 709, 93 S.Ct. at 1796. In the opinion of these congressmen, the Congress had the power to impose liability on the states on the one hand and individuals on the other, but not "local subdivisions" of government. *Ibid.*, footnote 24. The Conference Committee was told by the delegates from the House that a section of the Senate's proposed bill im-

2. The exclusion of "municipalities" from the scope of § 1983, see *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed. 2d 596 (1973) and *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), has no bearing on whether state officers are "persons" within the meaning of that statute. And the notion that the term "person" in § 1983 was not intended to refer to individual state officers, whether sued in their representative capacity or not, is so strained and would produce such a substan-

tial reduction in the power of the federal courts to vindicate federal rights, that I would be loathe to accept it without explicit direction from an appellate court.

The contention of the defendant that state officials sued in their official capacity are not "persons" because they are the "state," is an attempt to raise an Eleventh Amendment defense as if it were a statutory claim. It will be discussed in the following section on the Eleventh Amendment.

posing liability upon towns and counties ". . . must go out or we should fail to agree." 411 U.S. at 709, 93 S.Ct. at 1796. Congress had no doubt that states were subject to the provisions of the Fourteenth Amendment and could be held responsible for the preservation of a citizen's rights under the Constitution. See *Moor*, 411 U.S. 709, at footnote 24, 93 S.Ct. 1785. The argument that liability could clearly be placed upon the states was advanced against imposing such liability upon cities and counties. If liability could be constitutionally imposed on the states, it could be imposed on their agencies as well. While cities and counties were frequently mentioned in legislative debate as examples of the "subdivisions" not to be included as "persons" under § 1983, state agencies were not. Congress saw no constitutional impediment to imposing liability on state agencies and no need to place them beyond the ambit of § 1983.

■ I follow the law of this circuit holding such agencies to be "persons" for the purpose of § 1983. Subject matter jurisdiction in this suit against the defendant Board of Regents exists under 28 U.S.C. § 1343(3).

**B. *The Eleventh Amendment***

The Eleventh Amendment to the Constitution of the United States provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ." The Eleventh Amendment is considered to bar suits in federal court in which an unconsenting state is named as a defendant by one of its own citizens. *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Duhne v. New Jersey*, 251 U.S. 311, 40 S.Ct. 154, 64 L.Ed. 280 (1920); *Parden v. Terminal R. Co.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Defendant Weaver contends that because he is being sued in his official capacity, the plaintiff's suit against him is a suit against the state of Wisconsin for the purpose of the Eleventh Amendment. He considers it irrelevant that the plaintiff has requested only injunctive and declaratory relief, rather than monetary damages. He states that the law of Wisconsin considers a suit against a state officer in his or her "official" or "representative" capacity to be a suit against the state. I will assume that defendant Weaver is correct in that contention.

■ The proper interpretation of the Eleventh Amendment is a question of federal law. State law is relevant only to the extent that federal law makes it so. The history of the Eleventh Amendment reveals its purpose to be protection from suits brought in the federal courts seeking to impose a liability which must be paid from state governmental funds. *Cohens v. Virginia*, 19 U.S. 264, 405, 5 L.Ed. 257 (1821); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). It bars actions which are "in essence one(s) for the recovery of money from the state . . . even though individual officials are nominal defendants." *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945); accord, *Edelman v. Jordan, supra*.

■ In situations where a state official is sued for damages or a retroactive injunction compelling payments of some kind, a federal court may be required to consider the relationship under state law between the defendant official and the state. If that relationship is such that any monetary judgment rendered against the defendant official would necessarily be paid out of a state treasury rather than out of the official's personal resources, then a suit for monetary relief against that official will be considered, for the purpose of the Eleventh Amendment, a suit against the state. *Great Northern Life Insurance Co. v. Read*, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944); *Kennecott Copper Corp. v. State Tax Comm'n*, 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946).

■ Under constitutional principles long established and recently reaffirmed,

however, the Eleventh Amendment does not bar a suit by a citizen against a state officer where the relief requested is a prospective injunction against allegedly unconstitutional behavior on that officer's part. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Scheur v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

The *Young* principle—that a state official can be acting "under color of state law" for the purpose of the Fourteenth Amendment, though not qualifying as the "state" for the purpose of the Eleventh—has been called a "fiction." 3 Davis, *Administrative Law* § 27.03 (1958). If so, it is a durable fiction, critical to the network of protections afforded constitutional liberties. Long after the passage of the Eleventh Amendment, the Fourteenth Amendment created for the first time constitutional guarantees against the unwarranted exercise of state, as opposed to federal, power. Congress radically expanded the jurisdiction of the federal courts, demonstrating its intention to establish the federal judiciary as the primary "guarantor of basic federal rights against state power." *Mitchum v. Foster*, 407 U.S. 225, 238–239, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705 (1972); see also Frankfurter and Landis, *The Business of the Supreme Court: A Study in the Federal Judicial System*, 64 (1928). This guardianship could not be maintained by the federal courts if they lacked the power, claimed in *Young* and reaffirmed consistently since then,[3] to enjoin unconstitutional actions by state officials.

Defendant Weaver maintains that if defendants are enjoined to rehire plaintiff, his future wages will be paid out of state funds. It is a rare prospective injunction against a state official that will not affect a state treasury in the

same way.[4] Acceptance of defendant's position would severely limit *Young*. Defendant urges that *Edelman v. Jordan* and *Scheur v. Rhodes, supra,* lend support to his contention. Examination of *Edelman* or *Scheur* reveals that they explicitly rejected any narrowing of the *Young* principle. In *Edelman,* the court held the Eleventh Amendment a bar to a suit in federal court seeking the payment of back welfare benefits illegally withheld by a state agency from eligible recipients. The Court stated clearly that the Eleventh Amendment posed no bar to that part of the suit seeking an injunction to compel the payment of such benefits prospectively. The Court found that "such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in *Ex Parte Young, supra.*" 415 U.S. at 669, 94 S.Ct. at 1358. The Court is equally clear in *Scheur* that the rule of *Young* "that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law" remains "well settled" in cases involving "a question of the federal courts' injunctive power, [as opposed to claims] for monetary damages." 416 U.S. at 238–239, 94 S.Ct. at 1687.

■■■ Suits against state educational officers have been upheld against an Eleventh Amendment defense on previous occasions in this court. See, e. g., *Roth v. Board of Regents of State Colleges,* 310 F.Supp. 972 (W.D.Wis.1970), *aff'd* 446 F.2d 806 (7th Cir. 1971), *rev'd* on other grounds, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Lee v. Board of Regents of State Colleges,* 306 F.Supp. 1097 (1971) *aff'd* 441 F.2d 1257 (1971). Plaintiff's claim for prospective injunctive relief against defendant Weaver is not barred by the Eleventh Amendment.

---

3. See, e. g., *Georgia R.R. & Banking Co. v. Redwine,* 342 U.S. 299, 304, 72 S.Ct. 321, 96 L.Ed. 335 (1952).

4. See Justice Rehnquist's discussion of this point in *Edelman,* 415 U.S. at 651, 94 S.Ct. 1347.

▓ Defendant Board of Regents also claims that the plaintiff's suit against it is a suit against the state barred from federal court by the Eleventh Amendment. If this were a suit for damages I would be required to examine carefully whether any monetary judgment against the Board would be satisfied out of the state funds. See, e. g., *Hopkins v. Clemson College,* 221 U.S. 636, 31 S.Ct. 654, 55 L.Ed. 890 (1911). However, the relief requested is solely a prospective injunction. The principle of *Young* is as applicable to a suit against a state agency for prospective injunctive or declaratory relief as it is to a suit against an individual state officer. *Lee v. Board of Regents, supra* at 441 F.2d 1260. Plaintiff's suit against the Board is not barred by the Eleventh Amendment.

### II. *Motion to Dismiss for Failure to State a Claim*

### A. *Presence of "property" interest.*

Defendants contend that *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) conclusively hold that a nontenured faculty member whose contract has expired has no remaining interest in employment protected by the due process clause, and therefore can be severed from state employment without being afforded the procedural and substantive protections available when one's liberty or property is at stake. In *Roth,* the court noted that the record disclosed simply that a person hired by the state for one year had not been rehired for a second. It found in these circumstances alone no legally cognizable interest in continued employment requiring protection under the Fourteenth Amendment. But in *Perry* the Court stated that the absence of an explicit tenure provision in one's contract ". . . may not always foreclose the possibility that a teacher has a 'property' interest in re-employment." 408 U.S. at 601, 92 S.Ct. at 2769. It held that a plaintiff could well possess an interest in continued employment created by some other sort of contractual provision, expressed or implied, of which he or she could not be deprived constitutionally without being afforded due process. "Subjective expectancy" of future employment by a plaintiff is not sufficient to invoke constitutional protections, but a plaintiff claiming a protected property interest ". . . must be given an opportunity to prove the legitimacy of his claim of such entitlement in light of 'the policies and practices of the institution.'" 408 U.S. 603, 92 S.Ct. at 2700.

▓ In the present case the plaintiff has alleged an explicit, though unwritten, contractual agreement under which he was entitled to tenure provided certain conditions on his part were met, and he has alleged that those conditions were met. Dismissal for lack of such a protected interest would be proper only after consideration of whatever evidence the plaintiff may be able to submit.

### B. *Nature of appropriate due process protection.*

The Supreme Court has made clear that due process guarantees vary with factual and institutional contexts. See, for example, *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). In determining the nature of the due process protections to which the plaintiff in this case is entitled, I must ". . . begin with a determination of the precise nature of the governmental function involved as well as of the private interest that has been affected by governmental action." *Cafeteria and Restaurant Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961).

▓ The basic governmental and private interests at stake in tenure decisions are readily identifiable. Wisconsin has a valid and substantial interest in maintaining the highest possible standards of quality in the educational oportunities offered in its institutions

of higher learning. Because the grant of tenure is virtually a lifetime guarantee of the opportunity to teach and to engage in research within the University of Wisconsin system, the state has an interest in ensuring that those who are offered tenure are highly qualified to meet those responsibilities. The state is entitled to investigate the academic qualifications of faculty candidates, to assess those qualifications, and to grant or deny tenure to a given candidate on the basis of that assessment. The interest of the plaintiff in the tenure decision is also substantial. To be denied this virtual lifetime guarantee is a significant loss.[5]

Balancing these interests of the state and the plaintiff, I conclude that plaintiff was constitutionally entitled to some minimal due process.

It is plain from the complaint that during the period of more than two years while the initial decision of the Executive Committee was under review, plaintiff was afforded: a statement of the reasons why the university intended not to promote him; notice of a hearing at which he could respond to the stated reasons; and a hearing. But plaintiff contends that he was constitutionally entitled to further specific protections, which were denied him. Before considering separately his claims to each such protection, I offer an observation about the institutional context of this case which bears upon all of his claims.

■ Because the quality of the faculty of the university is importantly affected by the exercise of the tenure decision, the state has a valid and substantial interest in placing the power of operative decision in appropriate hands. Initially, the question is whether to place this power within or without the university community; it is reasonable to place it within the university. The question then becomes where to place it within the university; it is reasonable to place the power with the members of the departmental faculty concerned.

If this allocation of power within the institution comports with the due process clause of the Fourteenth Amendment, and I believe it does, many consequences flow. Perhaps the most consequential is that the operative decision will be formed by the departmental faculty over a period of years, based upon observation of the candidate, based upon intuitive responses to the candidate, based upon the particular member's developing opinion, and based upon the developing opinions entertained by other members to the extent that these opinions are shared from time to time, whether expressly or subtly. Although it is to be hoped that the members of the departmental faculty will develop their opinions of the candidate with all the objectivity and care they can muster, it is quite apparent that inevitably the subjectivity quotient will be high.

When the time for decision comes, it will not be entered upon a blank page—as it might be by a judge or a jury carefully chosen so as to exclude from the process any earlier acquaintance with the candidate and any earlier knowledge of his professional capacity and personal characteristics. To demand of the members of the departmental faculty that they consciously shed all earlier

5. Whether I may consider, without specific evidence of record, that negative consequences flow from the denial is unclear. In *Roth v. Board of Regents of State Colleges*, 310 F.Supp. 971, 979 (W.D.Wis.1970), I stated: " . . . [I]t is realistic to conclude that non-retention by one university or college creates concrete and practical difficulties for a professor in his subsequent academic career." The Court of Appeals noted "the substantial adverse effect non-retention is likely to have upon the career interests of an individual professor." 446 F.2d 806, 809. The Supreme Court emphasized (408 U.S. at 574, 92 S.Ct. 2701, N. 13) that this was no more than an "assumption," so far as the case record in *Roth* was concerned, but said that even if the assumption were made, "liberty," within the meaning of the due process clause, is not at stake when a decision against tenure by one employer renders a teacher less attractive to some other employers.

impressions of the candidate would be sharply to diminish the very justification for lodging with them the power of decision.

As against all this is the candidate's interest in a favorable decision on tenure. It does not follow inexorably that a a favorable decision is less likely to flow from the extended, complex, and somewhat obscure process I have described than from a formal procedure in which the decision is reached in a neutral and detached forum strictly upon the evidence presented to it. But when the time for decision comes, and the initial decision is unfavorable, the candidate's immediate interest lies in getting it changed. It is at this stage that there arises an intense desire on the part of the candidate for a wholly new forum; and, if not for a wholly new forum, then for procedural arrangements which lend maximum difficulty to adherence by the present forum to its initial decision. This represents the more precise setting within which the interests of the government and those of the candidate are to be balanced, and I am persuaded that the balance must be struck generally favorably to the interests of the government.

### 1. *Participation in initial decision making.*

■ Plaintiff contends that the failure of the defendants to allow him to participate in the deliberations of the Executive Committee between January and July of 1970, during which the Committee initially determined that he was not qualified for tenure, constituted a violation of procedural due process. One might well benefit from being present at every stage of a decision-making process which may adversely affect one's interest in liberty or property. The state can fairly claim, however, that informed and intelligent decision making is served by allowing certain stages of that same process to unfold free of the limits on candor and informality imposed by adversarial circumstances. In the particular institu-tional context of this case the exclusion of a tenure candidate from participation in the initial discussion by a faculty committee on whether to deny tenure is not a denial of due process. The state's constitutional ability to exclude an affected party from this initial stage of decision making is, however, contingent on the adequacy of the opportunity to respond to that decision later.

### 2. *Impartiality.*

Plaintiff alleges that the later hearing afforded him before the Executive Committee was constitutionally inadequate because (a) the same committee had earlier voted to deny him tenure; and (b) the committee had become hostile toward him because its conduct and decisions had been repeatedly disapproved by the dean.

Contention (a) must fail, particularly in light of *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). At stake in *Larkin* was a physician's license to practice medicine in Wisconsin, surely an economic stake at least comparable to plaintiff's economic stake in his teaching position. The members of the state medical examining board conducted an "investigative hearing" at which numerous witnesses testified and at which the physician's counsel was present. The board entered findings, conclusions, and a decision in which it found that the physician had engaged in specified conduct proscribed by statute. Its "decision" stated that there was probable cause to believe that the physician had violated criminal provisions of the statutes, and probable cause for a court action to revoke his license. Meantime, the board proposed to hold a "contested hearing" to determine whether the physician's license should be suspended temporarily. A three-judge district court had preliminarily enjoined the board from proceeding with the said contested hearing. The Supreme Court reversed, holding that it was quite unlikely that the physician would ultimately prevail in his contention that it would be a denial of due

process for the same board to hold a contested hearing on the issue of temporary suspension of the license after having conducted the investigative hearing and after having entered its findings, conclusions, and "decision." The Court emphasized (421 U.S. 55, 95 S. Ct. 1468):

> No specific foundation has been presented for suspecting that the Board had been prejudiced by its investigation or would be disabled from hearing and deciding on the basis of the evidence to be presented at the contested hearing. The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the board members at a later adversary hearing. Without a showing to the contrary, state administrators, "are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." *United States v. Morgan,* 313 U.S. 409, 421 [61 S.Ct. 999, 85 L.Ed. 1429] (1941).

██ I appreciate that there are many distinctions to be drawn between the facts in *Larkin* and the facts as alleged in the complaint in this case. During the "investigative" stage in *Larkin,* the members of the board presumably were not drawing upon their personal experiences with the particular physician over a period of time and were not engaging in subjective judgments about his qualifications; also, counsel for the physician was permitted to be present. Nevertheless, *Larkin* appears to be strong and fresh authority for the proposition that, in the absence of a showing of actual bias, an administrative board is not foreclosed from conducting a hearing on the merits of an issue simply because it has earlier examined into the facts and formed conclusions about them. For reasons I have stated above, this should be particularly so with respect to departmental faculty members and the question of tenure.

I appreciate that despite what I have said, fundamental fairness might require that when the ground for initial decision is narrowly factual—for example, alleged improper conduct on a specific occasion—, the conduct of the subsequent hearing and the review of the initial decision be consigned to another forum. But this complaint alleges that the Executive Committee's two stated reasons were that plaintiff's research was not such as to warrant promotion and that his area of complex analysis was adequately covered by tenured faculty. Plaintiff does not allege that the true reason was neither of these. He alleges only, as we shall see later, that neither of the stated reasons was supported by evidence presented at the hearing.

██ With respect to the matter of actual bias, I must accept presently as true plaintiff's allegation that prior to his hearing the Executive Committee had become hostile to him because its earlier actions had been criticized by the dean. A decision-making process which left final control over a determination in the hands of a board hostile to that party might well be constitutionally defective regardless of the substantiality of the state's interest in a given allocation of decision-making power. In this case, however, the state made available to the plaintiff some four levels of review through which the final decision of the Executive Committee could be, and was in fact, appealed. At none of these levels is it alleged that the reviewing parties were persons involved in any of the deliberations of the Executive Committee. The state thus took steps to insure that its interest in having the plaintiff's hearing held before the Executive Committee was not furthered at the cost of the plaintiff's interest in a fair and unbiased review of his initial tenure decision. I consider these stages of review constitutionally sufficient with respect to the allegation of actual bias. Also, they served as a corrective measure for whatever residual difficulties may

have persisted from the fact that the Executive Committee engaged in a hearing to consider the merits of its own initial decision.

3. *Confrontation with board members.*

Plaintiff argues that the failure of the Executive Committee to allow him to examine its members at his hearing was a violation of due process. As I have noted, there is nothing in the plaintiff's complaint, however, to suggest that the initial action of the Executive Committee depended on findings of primary fact. That action was ostensibly based on a subjective evaluation of the nature and quality of the plaintiff's research. In such a situation, the opportunity to question the members of the Executive Committee might be constitutionally required if needed to provide the plaintiff with an adequate description of the grounds on which the Committee initially denied him tenure. But according to the allegations of the complaint, the statement given the plaintiff permitted him to marshall and present at his hearing evidence overwhelmingly favorable to him and so extensive that the hearing lasted some four days.

4. *Grounds not adduced at hearing.*

 Plaintiff contends that the failure of the Executive Committee to base its final decision solely on evidence adduced at this hearing violated his right to procedural due process. Had the initial decision been based ostensibly on narrow factual grounds, fundamental fairness might require that all the evidence purporting to support those grounds be revealed and that the board consider only that evidence in making its determinations. But the original decision of the Executive Committee purported to evaluate the performance of the plaintiff in fulfilling his teaching and research responsibilities over some five years. Fairness required that before its decision became final, the Committee consider all evidence as to the quality of that performance that the plaintiff could marshall. But as I have said more fully earlier, it was not fundamentally unfair for the members of the Committee to give weight to their own subjective opinions of the plaintiff's work, formed over years of knowing and observing him. Such opinions are a rational and necessary ingredient of the qualitative evaluation at the heart of the tenure process.

5. *Incomplete participation by members.*

 Plaintiff argues that his hearing was constitutionally defective in that two members of the Executive Committee did not attend some part of the proceedings, though they later participated in the vote to reaffirm the original decision of the Committee denying the plaintiff tenure. No doubt the shoddy manner in which a hearing is conducted can sometimes support a finding that the aggrieved party has not received a hearing "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). From the allegations of the complaint it appears that though the plaintiff's hearing stretched over some four days, ten members were present at all times. The absence of two members from part of the hearing did not render the hearing constitutionally inadequate.

6. *Substantive arbitrariness.*

Plaintiff alleges that the decision of the Executive Committee, following the hearing, "was arbitrary and capricious in that it ignores the overwhelmingly favorable information placed before the Executive Committee." Plaintiff alleges that no adverse information whatever was presented to or by the committee at the hearings. He alleges that the arbitrariness of the decision is demonstrated by the committee's award of tenure to another assistant professor with the same research specialty, four months after the committee had asserted that plaintiff's area of complex analysis was already covered by tenured faculty.

It is not altogether clear in this circuit whether the "substantive" arbitrariness of an administrative decision raises a federal constitutional question under the due process clause. In *Jeffries v. Turkey Run Consolidated School District*, 492 F.2d 1 (7th cir. 1974), a public school teacher contended that the school board's decision not to renew her contract was completely without basis in fact or logic, and that such an arbitrary and capricious action violated her federal constitutional right to substantive due process. The Court affirmed a dismissal of the complaint on the ground that plaintiff had alleged no stake in "property" or "liberty" entitled to either "substantive" or "procedural" protection by the due process clause of the Fourteenth Amendment. In a rather strong dictum, the Court severely questioned whether federal judges should impose their own view as to what may be related or unrelated to the educational process or as to working relationships within schools. 492 F.2d, at 4. In *Miller v. School District Number 167, Cook County, Ill.*, 495 F.2d 658, 660 (7th cir. 1974), one of the claims of a non-renewed public school teacher was that the reasons for non-renewal as stated by the board were untrue "and that the board's action was arbitrary in the sense that it was completely unsupported by any acceptable reason . . . ." The court described this claim as "comparable to the 'substantive due process' argument which we recently rejected in *Jeffries* [citation omitted], and is therefore foreclosed by that decision." Thus, the dictum of *Jeffries* became a holding in *Miller*, binding on me. However, in *T. A. Moynahan Prop., Inc. v. Lancaster Village Coop., Inc.*, 496 F.2d 1114, 1117 (7th cir. 1974), the court declared that the cancellation of an agreement by a federal agency "could be challenged by demonstrating that there was no rational basis for the decision. . . . Cf. *Jeffries v. Turkey Run Consolidated District*, 492 F.2d 1, 3 (7th cir. 1974)." The court proceeded to decide that there

was a rational basis for the agency's decision in *Moynahan*.

It appears that any difficulty arising from this uncertainty as to the law of the circuit can be avoided here, however. The complaint does not allege that the stated reasons for the decision were arbitrarily or irrationally inappropriate. It alleges, rather, that no evidence to support the stated reasons was presented at the hearing. Perhaps if there was available to the Executive Committee no factual basis whatever for its stated grounds of decision, the due process clause would be violated. *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). See *Jeffries, supra*, at 5, n. 14. But both of the stated grounds for the decision here involved qualitative judgments of some sort, either of the plaintiff's abilities or of those of the tenured members of the Mathematics Department. Perhaps such decisions can never be found to be without basis in fact, for they are not wholly factual decisions. When a decision purports not to resolve questions of primary facts but to evaluate facts, the decision will often be based on the opinions of persons considered qualified to make qualitative judgments in a particular area of expertise. Such opinions may be considered an "evidentiary" basis.

 There is a narrower basis on which the plaintiff's claim must be rejected. He does not claim that the Executive Committee lacked any evidence on which to base its decision, but only that no such evidence was presented at his hearing. Thus his claim that the Executive Committee's decision was arbitrary is dependent on the validity of his claim that only evidence presented at his hearing could be considered when the Committee voted to affirm or reverse its original decision to deny the plaintiff tenure. Because I believe that the Committee was not bound to consider only evidence laid before it at the hearing, an allegation that the hearing evidence was exclusively favorable to the

plaintiff is not sufficient to support a claim that the action of the Committee subsequent to the hearing was arbitrary and capricious.

### Order

Upon the basis of the entire record herein, defendants' motion to dismiss is hereby granted and this action is dismissed on its merits, together with costs.