**Kermit GWATHMEY**

v.

**P. T. ATKINSON, Jr., et al.**

**Civ. A. No. 76–0235–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Oct. 8, 1976.

Melvin R. Hughes, Jr., Richmond, Va., for plaintiff.

Frank B. Miller, III, Mary Louise Kramer, Richmond, Va., for defendants.

## MEMORANDUM

WARRINER, District Judge.

Kermit Gwathmey, a school teacher who had a "continuing contract," was denied renewal of his contract with the Caroline County Public Schools after a hearing before the School Board on 20 May 1975. On 14 June 1976 Mr. Gwathmey filed suit with this Court seeking a judgment under 42 U.S.C. § 1983, 28 U.S.C. § 2201 that said denial constituted a violation of plaintiff's constitutional rights in that he was denied "substantive" due process. Jurisdiction is invoked pursuant to 42 U.S.C. § 1983; 28 U.S.C. § 1331 and § 1343.

The pertinent facts are as follows: Plaintiff, an unemployed school teacher with nineteen years teaching experience, became employed at the Bowling Green Elementary School, Bowling Green, Virginia, in 1972. Plaintiff achieved contract status as a teacher under the rules and regulations of the Caroline County Public Schools and under the statutes of Virginia.[1]

In 1974 plaintiff, while assigned to instructing a special class of students consisting of low educables and others requiring special education, was charged with physical abuse in connection with classroom discipline. The charge, based upon complaints by parents and students, was lodged by defendant Lucille Ruge, the elementary school supervisor. Defendant P. T. Atkinson, Jr., the Division Superintendent, recommended that the School Board take action against plaintiff. A hearing was held on 21 May 1974 which resulted in plaintiff being suspended for the balance of the 1973–1974 school year and being placed on probation for the school year 1974–1975. The basis for this action included reports of plaintiff's requiring a student to stay in a classroom bathroom as punishment, pulling a student's hair, pulling another's ear and pinching a student's shoulder.

---

1. Va.Code Ann. §§ 22–217.1, *et seq.* (Repl.Vol. 1973).

Plaintiff's 1974–1975 probation provided for written monthly evaluations by defendant Ruge and defendant W. T. Young, principal of Bowling Green Elementary School. It further provided for a program of surveillance by defendants Atkinson, Ruge and Young. No additional matters of plaintiff's abusive conduct were reported but defendants determined on the basis of the surveillance and the reports that plaintiff was incompetent to teach.

By letter dated 11 April 1975 defendant Atkinson gave plaintiff notice that his contract for the 1975–1976 school year would not be executed. The notice was given in compliance with Va.Code Ann. §§ 22–217.4, 217.5 (Repl.Vol. 1973). Plaintiff, by counsel requested a public hearing before the School Board as provided by Va.Code Ann. § 22–217.6 (Repl.Vol.1973).

On 20 May 1975 a public hearing was held wherein evidence of plaintiff's incompetency was presented to the School Board by defendants Atkinson, Young and Ruge. The essence of the evidence tendered by defendant Atkinson is contained in his deposition there taken at pages 11–13 and reads as follows:

Q. Mr. Atkinson, could you state to the Board in general what the shortcomings—what shortcomings of Mr. Gwathmey were reported to you and what did they consist of?

A. Basically the shortcomings, during this current year they had been those that indicated a lack of cooperation. The lack of accepting suggestions made not only by Mr. Young but also by Miss Ruge and in the performance of his teaching duties—suggestions were made in practically, if not all, instances. There was no indication from those involved with direct supervision, of any real or overt act on the part of Mr. Gwathmey to comply with their suggestions or requests as the case might be.

Q. Did you personally observe Mr. Gwathmey in his teaching role?

A. Yes. I was in Mr. Gwathmey's room one time toward the end of the year. Prior to that time I had been by the room a number of times. When I go into a room generally the atmosphere changes which is not to be unexpected. However, at that particular—on that particular day I was there about fifteen minutes. During which time I did not observe any instruction going on. Children were paying absolutely no attention and several were talking among themselves. They obviously had no planned activity or no scheduled activity. I had noted from Mr. Young's report, that the biggest problem seemed to be, the biggest problem revolved around the area of preparation and carrying through—in carrying through. I could see no evidence of preparation and the only activity that went on, one by one the children were called up to his desk and grades were taken from a paper. Now, that meant that for this period of time this was the instruction that was going on which really didn't amount to any.

Q. Instructions? Was that the only occasion you have seen him?

A. Yes, that's the only time that I really observed in that room for that period of time.

Q. Basically the foundation for your recommendation to the School Board was based on the recommendations from the principal? Is that correct?

A. The principal who is the immediate supervisor and Miss Ruge who was also instructed by the Board to make periodic checks.

Q. What is your customary routing so far as recommendations of principals and not following recommendations of principals?

A. If I feel that the recommendation of the principal is such that it needs my observation I then—I then make it a point to go and observe myself. However, these allegations were so clear-cut that I felt that Mr. Young had done an excellent job. He is very capable, he's a very capable supervisor.

The pertinent testimony that Mr. Young tendered to the board is in his deposition at pages 49–53 as follows:

Q. Did you make periodic observations with respect to his performance in the classroom?

A. Yes.

Q. Did you make written reports of those observations?

A. Yes.

Q. Did you discuss each of those observations with Mr. Gwathmey?

A. I did.

Q. Did you give him a copy or hand him a copy of your written report that you made?

A. Yes.

Q. And would you tell us sir, at the end of the school year whether you recommended for or against the reemployment of Mr. Gwathmey for the school years '75 and '74?

A. I recommended against it. . . .

.        .        .        .        .

Q. Generally Mr. Young, what was the problem that you were trying to solve with Mr. Gwathmey?

A. I was trying to get him to organize himself and manage his classroom because he was not doing it. I wanted him to manage it and I don't think he was meeting the needs of the children and he had, he had a disciplinary problem because of the lack of organization and management in his room.

Q. And after you had discussed these things with Mr. Gwathmey, did you see any change on his part, did things improve in the classroom?

A. No, sir. They did not.

Q. And as principal of the school, was it your judgment that he was not doing the job that the children needed to have done for them? Therefore, you recommended that he not be reemployed?

A. Yes.

Finally, the evidence tendered by defendant Ruge, found in her deposition at pages 102–104, states in relevant part:

Q. Now, you made an adverse recommendation in 1975?

A. Yes, sir.

Q. Can you tell the Board the reason why you made that recommendation and what you based it on? Your recommendation?

A. The standards of quality are negated. Within the standards of quality the responsibility of the teacher are specific. Included was, included in these specific responsibilities are Number one: The diagnosis of the learning needs, the planning and management of instruction to the students to meet the individual needs, the evaluation of the progress and all in a suitable psychological environment based on human needs and the worth of each individual. In my opinion Mr. Gwathmey is unable or unwilling to do these.

Q. What observations have you made, specific observations, that led you to that conclusion?

A. I think that has been documented in the letter. However, in general he was teaching all the children the same format if he was teaching them. A lot of it is allowing them to do their thing. Not following the teacher's manuals which are very good. Not knowing sometimes whether they were in the room or not. Not knowing what they are doing.

Q. You filed a written report I believe, from the dates of September 4th, October 30th, February 13th and, the February date being in '75 and the others in '74. These were the results from your observations that you made in the classroom?

A. Beg pardon?

Q. Did these three reports, which you filed, result from your observations which you made in the classroom?

A. Yes, sir.

Q. Would you tell the Board if you can and be more specific, what was wrong in the classroom that led you to believe that this was not the right teaching environment and that students were not getting what they should have gotten?

A. Nothing was happening. If I could read the standards of quality and that defines the teacher's responsibility and it's all there and it's very well done, none of these things were taking place. I saw no evidence of it at all.

Q. Are you saying that there was no evidence of teaching?

A. There was no evidence of direct teaching, there was no evidence of direct teaching or plans to meet the children's needs of evaluation. We do have ways of doing this and we do have management systems for doing this. One of our skilled management systems is documented and it shows what progress the children make and what skills and I think if you search the records you will find what I am saying is supported.

At the hearing plaintiff was represented by counsel who had an opportunity to cross-examine witnesses on plaintiff's behalf. By letter dated 22 May 1975 plaintiff was notified of the Board's decision not to renew his contract for the 1975–1976 session, and a copy of the hearing transcript was forwarded to plaintiff's counsel. The procedure followed at the hearing was in accordance with Va.Code Ann. §§ 22–217.4 *et seq.* (Repl.Vol. 1973).

II

This matter is now before the Court on defendant's motion for summary judgment, filed 26 August 1976 pursuant to Fed.R. Civ.P. 56, on the grounds that plaintiff's Fourteenth Amendment rights have not been violated and that, in any event, defendants are immune from liability in this action.

There is no suggestion of any lack of procedural due process. Indeed, the process afforded plaintiff was as prescribed by Virginia statute and probably substantially exceeded any federal requirement. Nor is there a claim that plaintiff was terminated in his employment in retaliation for the exercise of any federally protected right. *See Chitwood v. Feaster,* 468 F.2d 359 (4th Cir. 1972). Plaintiff does claim that there was a "substantive due process" failure in that there was no evidence of his incompetence. He further alleges that this failure was the result of bad faith on the part of defendants and that proof thereof invokes a number of factual determinations which are yet to be developed. Accordingly, plaintiff

moves that defendants' motion for summary judgment be denied.

Whether or not there are genuine issues of fact remaining herein may depend upon the scope and nature of review this Court must undertake with respect to the action of the School Board. Due process guarantees vary with factual or institutional contexts. *Stebbins v. Weaver,* 396 F.Supp. 104, 111 (W.D.Wis.1975). In the instant case due process affords only a limited review. If plaintiff were entitled to a trial de novo then of course there would be unresolved issues of fact remaining. But he is not so entitled. If this Court were required to look beyond the purported reasons for the School Board's action then again, perhaps, there would be issues of fact remaining. But neither is this required of us under the scrutiny appropriate herein.

All that plaintiff has standing to ask of the Court is to determine whether or not there was evidence before the School Board supporting its decision. *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). This is the law in a nutshell and we find that indeed there was evidence to support the finding of incompetence which justifies, at least from a constitutional standpoint, termination of plaintiff's employment.

For sound policy reasons courts are loathe to intrude upon the internal affairs of local school authorities in such matters as teacher incompetency. *Blunt v. Marion County School Bd.,* 515 F.2d 951, 956 (5th Cir. 1975). School boards, as well as other administrative agencies, should have wide discretion in deciding whether or not to continue employment of their personnel. Discretion, however, means exercise of judgment, not bias or capriciousness. Thus, such a decision must be based upon fact and supported by reasoned analysis. *Johnson v. Branch,* 364 F.2d 177, 181 (4th Cir. 1966). In *Johnson* the Fourth Circuit indicated that in testing the school board's decision:

[T]he district court must consider only the facts and logic relied upon by the

board itself. It is 'a simple but fundamental rule of administrative law that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.' . . . [T]he district court may not usurp the discretionary power of the school board but must judge the constitutionality of its action on the basis of the facts which were before the Board and on its logic. [Quotations omitted] 364 F.2d at 181.

Hence, precedent demands that this Court must limit its review to the evidence before the School Board with regard to plaintiff's competency to a determination as to whether or not a "reasoned analysis" of the evidence supports the Board's adverse finding.

The First Circuit has explicated upon the meaning of what is termed reasoned analysis in *Johnson*. In *Drown v. Portsmouth School District*, 451 F.2d 1106 (1st Cir. 1971) the Court was faced with a substantive due process claim similar to that herein. The School Board specified that plaintiff was not being retained because: 1) she had taken sick leave to attend a teacher's union meeting; 2) while her class work was assessed as "satisfactory" her department superiors reported her as being "uncooperative, disregarding schedules and not accepting direction;" and 3) she refused to attend a conference with her superiors to discuss her "situation."

The First Circuit accepted plaintiff's fundamental contention that a school board could not discharge or refuse to retain a teacher for reasons that are arbitrary and capricious. Noting that a statement of the rule was not necessarily helpful, the Court stated, at page 1108, that the reason may be arbitrary or capricious (or lacking in reasoned analysis in the words of *Johnson*) in any of three ways:

1) It may be unrelated to the educational process or to working relationships within the educational institution;

2) It may be arbitrary in that it is trivial;

3) It may be arbitrary if it is wholly unsupported by a basis in uncontested fact either in the statement or reasons itself or in the teacher's file.

With respect to basis number one, the Court, in *Drown*, noted that a teacher may not be fired for the type of automobile she drives or the kind of foods she eats. With respect to reason number two the Court cited *Johnson v. Branch, supra*. There the teacher's contract had not been renewed purportedly for seven infractions of school rules. While the Court in *Johnson* felt that the real reason the teacher was fired was that he was an unpopular civil rights activist, it also held that the infractions, ranging from arriving at school a few minutes after the sign-in time to arriving 15 minutes late to supervise an evening athletic contest, were simply too insignificant to justify the ultimate sanction of nonrenewal. In this regard the *Drown* court noted that "this is indeed a delicate judgment, and the court would be loathe to interfere except in egregious cases" 451 F.2d at 1108.

The instant case seems to be based upon a mixture of reason number 2 and reason number 3. In this regard the First Circuit in *Drown, supra*, at 1108–1109 said:

To state a claim under 42 U.S.C. § 1983 that a non-renewal was arbitrary and capricious, a teacher must at least attack each of the stated reasons on one of the grounds indicated above. It is not enough to claim that another, unstated reason was the "real" reason. Even if one of the stated reasons was arbitrary and capricious, another stated reason may have been adequate and thus have supported the non-renewal.

In the present case, we need look only to the school board's statement that "the English Department at the High School reports that you have been uncooperative, disregarding schedules and not accepting direction." Drown's principal challenge to this reason, as expressed in her motion to amend the complaint, was that "Said reason indicates that said defendants relied upon information contrary to the evaluation of plaintiff's teaching ability."

She does not challenge the assertion that some members of the English Department perceive her as uncooperative and unwilling to carry out departmental policy. To the extent that this is an assertion that the school board may consider only a teacher's classroom abilities in deciding whether to renew the contract of a non-tenured teacher, it misconceives the discretion entrusted to the local board. It is surely not arbitrary for the local board to value a spirit of cooperation within a department.

Drown goes on to contend that she was dismissed as a result of disputes with her superiors in the English Department with respect to curriculum and classroom procedures, to claim in effect that the members of the department found her to be uncooperative because she was innovative. But in *Drown I* we implied that nonrenewal of a teacher for being "too innovative and unconventional" would be proper under the wide discretion accorded the school board, 435 F.2d 1182 at 1185, even if a court or another board would think it wiser to have innovative but "uncooperative" teachers rather than bland but "cooperative" ones. Thus, the board's second reason for dismissal stands unshaken, and the district court properly dismissed the complaint. [Citations omitted] 451 F.2d at 1108–1109.

The administrative record in this case discloses the incompetence of plaintiff without peradventure. Given a public hearing with a friendly audience and given an opportunity for plaintiff's lawyer to grill plaintiff's superiors over an extended period of time, the factual basis upon which the determination that plaintiff was incompetent was not shaken. Indeed, it was strengthened.

■ To be sure, the evidence tendered to the board was in the nature of opinion based upon fact rather than primary facts themselves but this does not detract from its validity as noted in *Stebbins v. Weaver*, 396 F.Supp. 104 (W.D.Wis.1975). In *Stebbins* plaintiff alleged that the decision of the executive committee determining his tenure was "arbitrary and capricious in that it ignored the overwhelmingly favorable information placed before the executive committee." He alleged that no adverse information whatever was presented to the committee at the hearings. Though the District Court held that it was not altogether clear what the Seventh Circuit's view was on "substantive" arbitrariness of an administrative decision—as to whether it raises a federal constitutional question under the Due Process Clause—the Court noted that in *Jeffries v. Turkey Run Consolidated School District*, 492 F.2d 1 (7th Cir. 1974) the Court severely questioned whether federal judges should impose their own view as to what may be related or unrelated to the educational process or as to working relationships within schools. Later, in *Miller v. School District No. 167, Cook County, Illinois*, 495 F.2d 658, 660 (7th Cir. 1974), one of the claims of the non-renewed public school teacher was that the reasons for non-renewal "as stated by the board were untrue and that the board's action was arbitrary in the sense that it was completely unsupported by any acceptable reason." The Seventh Circuit described this claim as comparable to the " 'substantive due process' argument which we recently rejected in *Jeffries* and is therefore foreclosed by that decision" 495 F.2d at 660. In *Stebbins v. Weaver*, 396 F.Supp. 104, (W.D.Wis.1975) the Court noted:

> Perhaps if there was available to the Executive Committee no factual basis whatever for its stated grounds of decision the due process clause would be violated. . . . But both of the stated grounds of the decision here involved qualitative judgments of some sort, either of the plaintiff's abilities or those of the tenured members of the Mathematics Department. Perhaps such decision can never be found to be without basis in fact, for they are not wholly factual decisions. When a decision purports not to resolve questions of primary facts but to evaluate facts, the decision will often be based on the opinions of persons considered qualified to make qualitative judgments in a particular area of exper-

tise. Such opinions may be considered an "evidentiary" basis. [Citations omitted] 396 F.Supp. at 116.

As to plaintiff's contention that there are still unresolved issues of fact with regard to the motives behind defendants' opinions, we cite *Miller v. Board of Education of Jefferson County, Kentucky*, 54 F.R.D. 393 (W.D. Ky.1971). In that case a teacher claimed "arbitrary, capricious and conspiratorial" acts done to deprive her of a job as a teacher in the school system. 54 F.R.D. at 395. She was refused employment on the stated grounds that she had taken a year's leave of absence after having been specifically denied the right so to do. On a motion for summary judgment the Court ruled that mere allegations of arbitrariness, capriciousness and conspiracy cannot rob the board of its right to summary judgment where it is clear that there is no genuine issue of fact as to any arbitrary or other improper action. The board, opined the Court, was wholly justified in its refusal to rehire plaintiff.

As mentioned in *Johnson, supra*, this Court must only consider the facts and logic relied upon by the Board itself and we may not usurp its discretionary power. Indeed, we must uphold its actions if the record contains any objectively substantiated facts to support the Board's action. 364 F.2d at 181.

As to any argument that the record itself shows that the result was "excessively harsh" in light of the evidence before the Board and that this implies that the motivating cause was different from that set forth by the School Board we cite *Shaw v. Board of Trustees*, 396 F.Supp. 872 (D.Md. 1975). In *Shaw* an action was brought by discharged community college faculty members, who were division chiefs, asserting violation of civil and constitutional rights with respect to their discharge after they, together with certain other faculty members, joined in boycotting certain required college activities. In finding that there was no denial of procedural or substantive due process, the Court stated the following:

The plaintiffs have suggested that substantive due process has been denied them in that, they argue, the sanction imposed upon them by the Board was excessively harsh. As to that argument, this court holds that it is not the function of the court, in the guise of enforcing constitutional standards, to supplant the discretionary authority of state administrative bodies in the administration of their personnel policies regarding administrative level personnel. While an egregious case of extreme inconsistency between the triviality of the act and the severity of the punishment for the act might justify the inference that the punishment was, in fact, imposed for some reason other than the stated one, the harshness of the punishment in and of itself does not justify a federal court to intervene. While some language of the court's opinion in *Johnson v. Branch*, 364 F.2d 177, 182 (4th Cir. 1966), *cert. denied*, 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967), might support the proposition that a harsh punishment in and of itself can be considered constitutionally arbitrary and capricious, this court reads that case to have decided that the Board's action in that case was *solely* motivated by the black plaintiff's involvement in civil rights activities rather than by the infractions of school rules which the board found or used as a pretext for the infliction of the punishment. In *Drown v. Portsmouth School District*, 451 F.2d 1106 (1st Cir. 1971), the court, while in *dictum* accepting the proposition that punishment for so-called trivial actions might be arbitrary, denied relief for the teacher who had not been rehired based upon her uncooperativeness, disregard of schedules, and failure to accept direction, stating that the degree of punishment ". . . is indeed a delicate judgment, and a court would be loathe to interfere except in egregious cases." 451 F.2d at 1108, (emphasis in original). 396 F.Supp. at 889–890.

We also so read *Johnson*, and thus we attach no significance to the "punishment" in the instant case as an indicia of some

ulterior motive. Non-renewal can not be said to be egregious with respect to a finding of incompetency.

For these and the foregoing reasons, the Court finds, as a matter of law, that there is no due process violation herein. This is a Court of limited jurisdiction having no authority to right all wrongs or to rectify all errors. Where there is no substantial issue of fact it would be error to grant a plenary hearing and a trial on the merits. It would also be an imposition upon the school officials to have the thought, effort, resources and money diverted to litigation which properly belongs to education.

In conclusion, we deem it appropriate to reiterate the words recently spoken by our Supreme Court in a more general sense about the underlying issue in this case:

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review of every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular, and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

An appropriate order shall issue.